UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY D. DINTZER, an individual; and AMY R. FORBES, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> NAVIOS MARITIME HOLDINGS, INC., a Republic of the Marshall Islands corporation; ANGELIKI N. FRANGOU, an individual; SPYRIDON MAGOULAS, an individual; GEORGE MALANGA, an individual; JOHN STRATAKIS, an individual; SHUNJI SASADA, an individual, <br><br> Defendants. | **CASE NO. 1:25-cv-04650-NRB** <br><br> **COMPLAINT FOR:** <br><br> 1. **BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER** <br><br> 2. **BREACH OF FIDUCIARY DUTY BY DIRECTORS** <br><br> 3. **COMMON LAW FRAUD** <br><br> 4. **ENFORCEMENT OF SHAREHOLDER'S RIGHT TO INSPECT CORPORATE BOOKS AND RECORDS** <br><br> **JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiffs Jeffrey D. Dintzer and Amy R. Forbes (together, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendant Navios Maritime Holdings, Inc. ("NMH" or the "Company"); NMH's CEO, chairwoman, and majority shareholder, Angeliki Frangou ("Frangou"); and certain of its directors (the "Director Defendants," defined below). Plaintiffs allege the following based upon knowledge of their own respective actions, and upon information and belief, following the investigation of Plaintiffs' counsel and the review of publicly available information, as to all other matters.

## NATURE OF THE ACTION

1.    Plaintiffs—both investors holding NMH's American Depositary Shares ("ADSs")—are victims of a years-long, disloyal scheme perpetrated by NMH's CEO, Chairwoman, and majority common shareholder, Frangou, and aided and abetted by NMH's compliant Board of Directors, to cheat the Company's ADS holders out of the value of their preferred stock-based investments for Frangou's sole financial benefit.

2.    As alleged in detail below, the value of Plaintiffs' ADS investments cratered following NMH's unexpected January 19, 2024, announcement that its Board of Directors decided to delist the Company's Series G and Series H ADSs (defined below) from trading on the NYSE and withdrawing their registration with the SEC (the "Delisting"). In short order, the Delisting rendered Plaintiffs' liquid investments in NMH's ADSs illiquid by relegating them to trading only on the OTC Pink Market.

3.    The NMH Board of Directors' decision to delist and deregister the ADSs was not intended to achieve any legitimate business purpose. Rather, NMH's Board, which was and is dominated and controlled by Frangou, executed the Delisting to coercively and artificially depress the market price for the outstanding ADSs so that NMH (now wholly owned by

2

COMPLAINT

Frangou) could buy them up at rock bottom prices from investors who were unexpectedly faced with a radically changed risk profile for their NMH investment and looking for an exit.

4.      Because NMH's common stock is junior to the Preferred Stock (defined below) that is traded through the Company's ADSs, Frangou can only reap the financial benefit of owning all the Company's common stock by first eliminating NMH's significant financial obligations to its ADS Holders. Over time, these financial obligations—specifically, the accrued and unpaid dividends on the ADSs—have ballooned to total tens of millions of dollars that neither Frangou nor the Defendant Directors ever intended to pay the ADS Holders. By executing the Delisting and following it with the Tender Offer (defined below), Frangou and the Director Defendants intended for NMH to purchase as many ADSs as possible at prices that clearly do not reflect the investment's true value. With each ADS acquired, NMH would reduce its liability for the dividends and, conversely, create greater value for Frangou's investment.

5.      By this action, Plaintiffs seek to hold Frangou and the Director Defendants accountable for breaching the fiduciary duties they owe to ADS holders by taking and approving actions that benefited Frangou at the ADS holders' expense, and for causing NMH to brazenly issue false and misleading public statements concerning the impact of the 4th Quarter 2023 merger transaction that would take NMH private under Frangou's sole ownership (the "Going Private Transaction") on the status quo for the Company's ADSs after the transaction closed, and conceal from Plaintiffs and other ADS holders Frangou's true scheme to coerce value from ADS holders like Plaintiffs for her own benefit.

COMPLAINT

## THE PARTIES

### Plaintiffs

6.      Plaintiff Jeffrey D. Dintzer is a resident of Encino, California. He has continuously owned Series G ADSs during the period Defendants committed the unlawful actions alleged herein. Mr. Dintzer currently holds 30,000 shares of NMH's Series G ADSs.

7.      Plaintiff Amy R. Forbes is a resident of Los Angeles, California. She has continuously owned Series G and Series H ADSs during the period Defendants committed the unlawful actions alleged herein. Ms. Forbes currently holds 3,750 shares of NMH's Series G ADSs and 3,750 shares of the Series H ADSs.

### Defendants

8.      Defendant NMH is incorporated under the laws of the Republic of the Marshall Islands and has its principal executive offices in Grand Cayman, Cayman Islands. NMH maintains an office in New York, New York.

9.      Defendant Frangou has served as the CEO and Chairwoman of NMH since August 2005. Frangou resides in New York, New York.

10.     Defendant George Malanga ("Malanga") has served as a director of NMH since April 2010 and was Chairman of the Special Committee of NMH formed to consider the fairness of the Going Private Transaction (the "Special Committee"). Malanga resides in Basking Ridge, New Jersey.

11.     Defendant Spyridon Magoulas ("Magoulas") has served as a director of NMH since its inception and served on the Special Committee with Malanga. Magoulas resides in Astoria, New York.

COMPLAINT

12.     Defendant John Stratakis ("Stratakis") has served as a director of NMH since its inception. Stratakis resides in Manhasset, New York.

13.     Defendant Shunji Sasada ("Sasada") has served as a director of NMH and as the President of Navios Corporation, NMH's wholly owned subsidiary, since January 2015. Sasada resides in Riverside, Connecticut.

14.     Defendants Magoulas, Malanga, Stratakis, and Sasada are collectively referred to herein as the "Director Defendants."

### Relevant Non-Parties

15.     Vasiliki Papaefthymiou ("Papaefthymiou") has been NMH's Executive Vice President — Legal and a director since the Company's inception. She also serves as NMH's corporate secretary. Papaefthymiou does not reside in the United States.

16.     Efstathios Loizos ("Loizos") has served as a director of NMH since July 2010. Loizos does not reside in the United States.

17.     Michael Pearson ("Pearson") has served as a director of NMH since April 2021. Pearson does not reside in the United States.

18.     Papaefthymiou, Loizos, and Pearson, together with Frangou and the Director Defendants, are the "Board of Directors."

### JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because diversity exists between the Plaintiffs, NMH, and the Director Defendants, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     This Court has personal jurisdiction over NMH and the Director Defendants because both the Series G and Series H ADSs traded on the NYSE until the Director Defendants

COMPLAINT

caused NMH to initiate and effectuate the Delisting in January 2024. The harm resulting from Defendants' actions occurred on the NYSE, which is located in New York, and was suffered by Plaintiffs, whose investments were held in that market.

21.    Moreover, Bank of New York Mellon, which is headquartered in New York, is the "Depositary" for NMH's Preferred Stock (defined below) and is technically the only "holder" of the Preferred Stock, whereas public shareholders like Plaintiffs own the ADSs through which the Preferred Stock trades.

22.    NMH also maintains an office in New York at 599 Lexington Avenue, 35th Floor, New York, NY 10022.

23.    Director Defendants Frangou, Magoulas, and Stratakis, and Sasada maintain residences in New York.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, *i.e.*, Plaintiffs' claims arose in this District and they suffered harm in this District.

## SUBSTANTIVE ALLEGATIONS

### Background on NMH and Frangou's Ownership Interest in the Company

25.    NMH is a global maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including iron ore, coal, and grain. Through a web of complicated stock ownership and corporate entities, NMH controls a myriad of other shipping corporations that operate under the "Navios" brand.

26.    Frangou began regularly purchasing NMH's common stock after she became its CEO and Chairwoman in August 2005. By the time the Going Private Transaction was announced in October 2023, Frangou owned 64.8% of NMH's common stock through her

COMPLAINT

investment holding company, N Logistics Holdings Corporation ("NLHC"). After taking NMH private in December 2023, Frangou owned 100% of NMH's common stock through NLHC.

**Background on NMH's Series G and Series H ADSs**

27.     NMH has two relevant outstanding series of preferred stock: the 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock ("Series G"), and the 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock ("Series H" and, together with Series G, the "Preferred Stock"). The Preferred Stock trades in the form of ADSs, each of which represents a $1/100^{th}$ interest in a preferred share.

28.     In January 2014, NMH offered for sale 2,000,000 ADSs, each of which represents, and entitles the holder, subject to the terms of the Deposit Agreement, to proportional rights and preferences (including dividends, voting, redemption and liquidation rights and preferences) as if the holder held $1/100^{th}$ of one share of the Company's 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock (the "Series G ADSs").

29.     In June 2014, NMH offered for sale 4,800,000 ADSs, each of which represents, and entitles the holder, subject to the terms of the Deposit Agreement, to proportional rights and preferences (including dividends, voting, redemption and liquidation rights and preferences) as if the holder held $1/100^{th}$ of one share of the Company's 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock (the "Series H ADSs").

30.     Both the Series G and Series H ADSs have a liquidation preference of $25.00 per ADS.

31.     NMH's Certificates of Designation for both series of its Preferred Stock set forth the rights and protections that are proportionally afforded to the ADS holders, *e.g.*:

a.  Dividends on each series of Preferred Stock are cumulative and accrue quarterly. Accordingly, if NMH fails to make a quarterly dividend payment to the ADS holders, the dividend amount will still accrue.

b.  Both series of NMH's Preferred Stock are perpetual, meaning that they have no set redemption date and therefore remain outstanding until NMH either redeems them or makes an offer to repurchase them, such as an exchange offer or tender offer.

c.  If dividends on the Preferred Stock are in arrears for six or more quarterly periods, the ADS holders have the right to collectively elect one member to the NMH Board or receive a 25-basis point increase in the applicable dividend rate.

d.  NMH must pay any and all accrued and unpaid dividends on its Preferred Stock before it can pay dividends on its common shares. Further, unless NMH pays in full the accrued and unpaid preferred dividends, the Company may not redeem, repurchase, or otherwise acquire its common stock or ADS, except through an offer made to all ADS holders.

32.    NMH marketed both series of ADSs by telling investors that they had been approved for listing on the NYSE. According to NYSE rules, a listing on the NYSE is continuous once it its approved, as long as fees are paid by the listing company.

33.    The Series G and Series H ADSs were traded on the NYSE under the ticker symbols "NM-PG" and "NM-PH," respectively, from the date of each series' initial offering for sale in 2014 until NMH delisted the ADSs on February 8, 2024.

COMPLAINT

34.    Neither the ADSs' respective Certificates of Designation nor the Prospectus Supplements used to market them disclosed to investors any risk or concern that the ADSs would cease to be listed on the NYSE for any or no reason.

35.    Neither the ADSs' respective Certificates of Designation nor the Prospectus Supplements used to market them identified any circumstances that would cause NMH to voluntarily delist the ADSs.

36.    NMH received over $150,000,000 in gross proceeds from the sale of its Series G and Series H ADSs to the investing public. The Company told investors these funds would be used for "general corporate purposes."

**Plaintiffs Each Decide to Invest in NMH's ADSs**

37.    Plaintiffs made their first purchases of NMH ADSs years after the Company initially offered them for sale to the investing public.

38.    Plaintiffs have been friends and colleagues for years. At various times during the course of their relationship, Mr. Dintzer and Ms. Forbes discussed their personal investments and potential opportunities for investments.

39.    Mr. Dintzer first became aware of NMH as potential investment target in early October 2021. After researching NMH's business and historical financial performance, Mr. Dintzer began investigating the investment potential of the Company's ADSs. Before making the decision to invest in the ADSs, Mr. Dintzer reviewed NMH's January 2014 Prospectus Supplement for the Series G ADSs, various other SEC filings made by the Company between 2014 and 2021 relating to the ADSs, and several analyst reports.

40.    Based on the materials he reviewed in or about October 2021, Mr. Dintzer learned: (1) NMH suspended its payment of quarterly dividends on its ADSs starting in February

COMPLAINT

2016 and had not yet resumed the payments; (2) the dividend rate on both series of ADSs had been increased by 0.25% because NMH was in arrears on the dividend payments; and (3) in December 2018, NMH conducted an exchange offer for both series of its ADSs.

41.    Mr. Dintzer ultimately decided to invest in the Series G ADSs for two key reasons: (1) they were traded on the highly liquid NYSE; and (2) due to unpaid dividends continuing to accrue on the ADSs, the investment had significant upside potential if the Company decided to redeem the ADSs (which would require payment of a $25 liquidation price per ADS, as well as payment of all accrued and unpaid dividends) or make a tender offer or exchange offer to ADS holders that fairly priced in the value of the accrued and unpaid dividends.

42.    After Mr. Dintzer made his initial purchase of Series G ADSs on October 11, 2021, he discussed with Ms. Forbes the potential he saw for this investment.

43.    Ms. Forbes was impressed by Mr. Dintzer's reasoning for investing in the ADSs and thereafter purchased Series G and Series H ADSs in February and March 2022.

## **Plaintiffs Rely on NMH's Public Statements That the Company's ADSs Will Be "Unaffected" By the Going Private Transaction**

44.    On October 23, 2023, NMH announced that its Board of Directors approved the Going Private Transaction. Pursuant to the parties' definitive merger agreement, Frangou's investment company, NLHC, would acquire all the outstanding shares of NMH common stock that it did not already own for $2.28 per share in cash. After closing, NMH would be wholly owned by Frangou through her ownership of NLHC.

45.    On November 13, 2023, the NMH Special Committee appointed to evaluate the Going Private Transaction sent proxy materials—specifically, the Proxy Statement and

COMPLAINT

supporting exhibits—to the Company's common shareholders to solicit their approval of the deal. The Proxy Statement was among the documents NMH publicly filed with the SEC in connection with the Going Private Transaction.

46.    The Proxy Statement and other documents the Company publicly filed with the SEC explained that, as part of the merger transaction, NMH would facilitate the exchange of all shareholder's common shares for the $2.28 per share consideration once the shareholders voted to approve the transaction. At that point, NMH's common shares would cease to be publicly traded because they would all be owned by NLHC. NMH thereafter would cause its common shares to be delisted from the NYSE and deregistered from the SEC. The delisting and deregistration of the NMH common stock following the transaction's shareholder approval was explained as a key part of the transaction in the Proxy Statement's "Questions and Answers" section, and was discussed five more times in the Proxy Statement and its supporting exhibits.

47.    NMH's SEC filings related to the Going Private Transaction also addressed the Series G and Series H ADSs. These filings consistently stated that the Company's Preferred Stock and the ADSs through which they were traded on the NYSE would be "unaffected" by the Going Private Transaction and "would remain outstanding as identical securities" of NMH after the transaction closed. NMH's SEC filings made no mention of a proposed or potential delisting or deregistration of the ADSs. For example:

      a.    NMH's Form 6-K press release, filed October 22, 2023, was the Company's first public disclosure of the Going Private Transaction. With regard to the ADSs, NMH stated that "[t]he Company's outstanding shares of (i) 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock (and the related American Depositary Shares) [and] (ii) 8.625% Series H Cumulative Redeemable Perpetual

COMPLAINT

Preferred Stock (and the related American Depositary Shares) . . . ***will be unaffected by the Merger and remain outstanding as identical securities of the surviving corporation.***" (See p. 2, emphasis added.) The "surviving corporation" referenced in this press release and in NMH's subsequent filings with the SEC, was NMH under the complete ownership of Frangou, through NLHC.

b.  In NMH's SEC Rule 13e-3 Transaction Statement, filed November 13, 2023, the "Introduction" expressly states that "[t]he Company's outstanding shares of (i) 8.75% Series G Cumulative Redeemable Perpetual Preferred Stock (and the related American Depositary Shares) [and] (ii) 8.625% Series H Cumulative Redeemable Perpetual Preferred Stock (and the related American Depositary Shares) . . . ***will be unaffected by the Merger and remain outstanding as identical securities of the Surviving Corporation.***" (See p. 1, emphasis added.)

c.  In NMH's Proxy Statement, dated November 13, 2023 (filed as the Item 16(a)(1) attachment to Schedule 13E-3), the same statement was made multiple times:

   i.  In response to the question "As a stockholder, what will I receive in the Merger?" NMH responds that "[t]he Company's outstanding shares of Series G Preferred Stock (and the related American Depositary Shares) [and] Series H Preferred Stock (and the related American Depositary Shares) . . . ***will be unaffected by the Merger and remain outstanding as identical securities of the Surviving Corporation.***" (See p. 10, emphasis added.)

   ii.  In the section "Certain Effects of the Merger" under "Effect on Ownership Structure," NMH states that "[t]he Company's outstanding shares of Series

G Preferred Stock (and the related American Depositary Shares) [and]

Series H Preferred Stock (and the related American Depositary Shares) . . .

***will be unaffected by the Merger and remain outstanding as identical***

***securities of the Surviving Corporation.***" (See pp. 41-42, emphasis

added.)

 iii. In the section "The Merger," NMH states that "[t]he Company's

outstanding shares of Series G Preferred Stock (and the related American

Depositary Shares) [and] Series H Preferred Stock (and the related

American Depositary Shares) . . . ***will be unaffected by the Merger and***

***remain outstanding as identical securities of the Surviving***

***Corporation.***" (See p. 60, emphasis added.)

 iv. In the section "Treatment of Preferred Stock," NMH states that "[t]he

Company's outstanding shares of Series G Preferred Stock (and the related

American Depositary Shares) [and] Series H Preferred Stock (and the

related American Depositary Shares) . . . ***will be unaffected by the***

***Merger, remain outstanding as identical securities of the Surviving***

***Corporation and be entitled to the same dividend and other relative***

***rights, preferences, limitations and restrictions as are now provided by***

***the certificate of designation applicable to such series of Preferred***

***Stock.***" (See p. 61, emphasis added.)

d. In the Agreement and Plan of Merger, dated October 22, 2023 ("Merger

Agreement," filed as the Item 16(a)(1) attachment to Schedule 13E-3), Section

3.01(f), which addresses the "Treatment of Preferred Stock," the provides:

COMPLAINT

i.  "*[E]ach share of Series G Preferred Stock issued and outstanding immediately prior to the Effective Time shall be unaffected by the Merger and remain outstanding as one share of Series G Preferred Stock of the Surviving Corporation entitled to the same dividends and all other preferences and privileges, voting rights, relative, participating, optional and other special rights*, and subject to the same qualifications, limitations and restrictions, in each case, as set forth in the Series G Certificate of Designation as of immediately prior to the Effective Time, and *each depositary share issued pursuant to the Series G Deposit Agreement, representing one-hundredth of one share of Series G Preferred Stock issued and outstanding immediately prior to the Effective Time shall be unaffected by the Merger and remain outstanding* and represent one-hundredth of one share of Series G Preferred Stock of the Surviving Corporation. . . ." (See p. A-12, emphasis added.)

ii. Similarly, "*each share of Series H Preferred Stock issued and outstanding immediately prior to the Effective Time shall be unaffected by the Merger and remain outstanding as one share of Series H Preferred Stock of the Surviving Corporation entitled to the same dividends and all other preferences and privileges, voting rights, relative, participating, optional and other special rights*, and subject to the same qualifications, limitations and restrictions, in each case, as set forth in the Series H Certificate of Designation as of immediately prior to the

COMPLAINT

Effective Time, and ***each depositary share issued pursuant to the Series H Deposit Agreement, representing one-hundredth of one share of Series H Preferred Stock issued and outstanding immediately prior to the Effective Time shall be unaffected by the Merger and remain outstanding*** and represent one-hundredth of one share of Series H Preferred Stock of the Surviving Corporation." (*Id.*)

    e. In Amendment No. 1 to NMH's SEC Rule 13e-3 Transaction Statement, filed December 14, 2023, NMH again states that "[t]he Company's outstanding shares of Series G Preferred Stock (and the related American Depositary Shares) [and] Series H Preferred Stock (and the related American Depositary Shares) . . . ***were unaffected by the Merger and remain outstanding as identical securities of the Surviving Corporation***." (See p. 1, emphasis added.)

48. The foregoing documents were reviewed and signed by NMH's officers and directors—*e.g.*, Frangou, Papaefthymiou, Malanga—and the Board of Directors (including each of the Director Defendants) authorized them to be filed with the SEC.

49. Plaintiffs learned about the Going Private Transaction shortly after NMH issued the October 22, 2023, press release. Mr. Dintzer and Ms. Forbes discussed with each other the documents referenced above at or near the time NMH filed each of them with the SEC, as they both were concerned that the proposed Going Private Transaction could have some impact on their respective investments in NMH's ADSs.

50. Plaintiffs found the consistency of NMH's statements regarding the ADSs reassuring. Mr. Dintzer and Ms. Forbes understood NMH's repeated assertion that both series of ADSs would be "unaffected" by the Going Private Transaction and that they "would remain

COMPLAINT

outstanding as identical securities" of NMH under its new ownership to mean not only that the rights afforded ADS holders under the Certificates of Designation would not change as a result of the transaction, but also that Plaintiffs' ability to buy and sell the ADSs on the NYSE would not be affected. Based on NMH's statements, both Mr. Dintzer and Ms. Forbes believed that NMH, under Frangou's ownership and control, would maintain the status quo for the Company's ADSs.

51.    As noted above, NMH's delisting and deregistration of its common stock was an anticipated result of the Going Private Transaction that was explicitly addressed in NMH's Schedule 13E-3, Proxy Statement, and the Merger Agreement. Accordingly, had NMH intended for the delisting and deregistration of the Series G ADSs to be an anticipated result in connection with the same transaction, the Company was fully capable of using direct and explicit language to inform Plaintiffs and other ADS holders of this information in its SEC filings. Notably, no such statements were made in any of NMH's SEC filings related to the Going Private Transaction.

52.    Neither Mr. Dintzer nor Ms. Forbes understood or interpreted NMH's statements that the ADSs would be "unaffected" by the Going Private Transaction and "would remain outstanding as identical securities" of NMH under its new ownership to leave open the possibility that the ADSs would be delisted, deregistered, and made effectively illiquid just a month after the transaction closed.

53.    At several times between the October 23, 2024, announcement of the Going Private Action and the transaction's closing on December 14, 2023, Plaintiffs both discussed together and individually considered NMH's various disclosures and evaluated whether the transaction, as it had been disclosed to the public, posed a present or near-term threat to the value and/or liquidity of their respective investments in NMH's ADSs. Had there been such a threat,

both Mr. Dintzer and Ms. Forbes would have sold some or all of their ADSs to avoid significant financial losses and the loss of liquidity.

54.    Ultimately, in reliance on NMH's public statements that the Going Private Transaction would not affect the ADSs, both Mr. Dintzer and Ms. Forbes decided not to sell any part of their respective investments.

55.    The Going Private Transaction closed on December 14, 2023.

## NMH Announces Its Voluntary Delisting and Deregistration of the Series G and Series H ADSs

56.    Ten minutes after the close of trading on Friday, January 19, 2024, NMH issued a press release announcing that its Board of Directors had approved the delisting and deregistration of both its Series G and Series H ADSs and that the last day of trading for both ADSs on the NYSE would be on or about February 8, 2024 (the "Delisting").

57.    At no time prior to NMH's issuance of this press release did the Company, Frangou, or any member of the Board of Directors indicate in any public statements that NMH planned to delist and deregister either series of its ADSs.

58.    In the January 19, 2024, press release, NME's Board of Directors justified its decision to delist and deregister its ADSs by stating that "[t]he Company believes that the costs associated with continuing the listing and registration of its ADSs exceed the benefits received by the Company and its decision to delist and deregister the ADSs will better enable it to maximize value for stakeholders."

59.    Further, the Board of Directors claimed that their decision "was made after careful consideration of the advantages and disadvantages of continuing listing and registration and based on a review of several factors, including preserving cash by eliminating the legal, audit

COMPLAINT

and other costs associated with maintaining the Company's listing and remaining an SEC reporting company under the Exchange Act and preparing and filing periodic reports with the SEC and the limited trading volume of the ADSs."

60.    News of the Delisting had a direct deleterious impact on the market price for both series of NMH's ADSs.

61.    The price for Series G ADSs cratered by the end of the next trading day. It fell $8.48 from the previous Friday's close of $12.50 to close at $4.02, though the price did hit an intraday low of $2.75. News of the Delisting clearly precipitated a sell-off: on January 22 (the next trading day), the Series G ADSs traded at a volume roughly 32 times greater than on January 19.

62.    Similarly, the price for Series H ADSs fell $10.00 from its January 19 close of $13.50 to close at $3.50, though the price did hit an intraday low of $1.80. On January 22, the Series H ADSs traded at a volume roughly 24 times greater than on January 19.

63.    At no time in the 20 days before the Series G and Series H ADSs were officially delisted and relegated to trading on the OTC Pink Market did their market prices recover. On the last day of trading on the NYSE, the Series G ADSs closed at $5.00 and the Series H ADSs closed at $3.27.

64.    To provide perspective on how devastating NMH's announcement of the Delisting was to investors like the Plaintiffs, in the year prior to January 22, 2024, the Series G ADSs traded as high as $23.50 (close on February 23, 2023) and in the six months prior to January 22, 2024, they traded as high as $21.94 (close on September 8, 2023). Similarly, in the year prior to January 22, 2024, the Series H ADSs traded as high as $23.50 (close on February 28, 2023) and

in the six months prior to January 22, 2024, they traded as high as $21.75 (close on July 18, 2023).

### NMH Announces a Tender Offer to Buy Up Its Outstanding ADSs on the Cheap

65.     Between February 9, 2024 (the first day the ADSs were traded on the OTC Pink Market), and May 9, 2024, the Series G ADSs traded in low volume at rock-bottom prices ranging from a low of $1.50 (close on February 12, 2024) to a high of $5.60 (at close on March 19, 2024). During the same period, the Series H ADSs also traded in low volumes at prices ranging from a low of $0.01(close on February 12, 2024) and a high of $4.95 (close on March 21, 2024). These were historically low prices for both series of ADSs.

66.     On May 10, 2024, NMH issued a press release announcing that it had commenced a tender offer to purchase any and all outstanding Series G and Series H ADSs for cash (the "Tender Offer"). Specifically, NMH offered $5.75 per share for all ADSs of either series tendered on or before 5:00 p.m. EST on May 21, 2024 (the "Early Tender Consideration"), and $4.75 per share for all ADSs of either series tendered thereafter until midnight EST on June 7, 2024 ("Expiration Consideration").

67.     NMH claimed its Early Tender Consideration was a 28% premium for the Series H ADSs and a 35% premium for the Series G ADSs over their last respective trading prices on the OTC Pink Market.

68.     NMH further claimed that its Expiration Consideration was a 6% premium for the Series H ADSs and a 12% premium for the Series G ADSs over their last respective trading prices on the OTC Pink Market.

69.     Holders who participated in the Tender Offer were informed by NMH that by doing so they would lose the right to receive any unpaid distributions or dividends on the

tendered ADSs for periods during which the holder held such ADSs and would lose their right to receive any future distributions or dividends with respect to any ADSs tendered.

70.    At the time NMH announced the Tender Offer, only 514,720 Series G ADSs (down from 2,000,000 issued) and 1,183,944 Series H ADSs (down from 4,8000,000 issued) remained outstanding and were not held or cancelled by the Company.

71.    Though NMH did not condition the Tender Offer on its receipt of a minimum number of ADSs, the Company did warn holders that their investments in the ADSs risked a greater reduction in liquidity on the OTC Pink Market should they not tender their shares.

72.    Plaintiffs did not participate in NMH's Tender Offer. As of the filing of this action, both Mr. Dintzer and Ms. Forbes continue to hold their respective investments in the Company's ADSs. Had either of the Plaintiffs tendered their ADSs, they would have realized significant losses on their investments and released their respective rights to the significant value of dividends in arrears on each ADS they each own.

73.    Plaintiffs both now find themselves holding significantly devalued investments in NMH's ADSs that can only trade on the illiquid OTC Pink Market.

**NMH's Actions After Going Private Betray Frangou's Years-Long, Disloyal Scheme to Enrich Herself at the ADS Holders' Expense**

74.    News of the Delisting raised Plaintiffs' suspicions that Frangou and the NMH Board of Directors had not been honest in telling ADS holders that their investments would be "unaffected" by the Going Private Transaction. News of the Tender Offer confirmed their suspicions.

COMPLAINT

75.     Unbeknown to Plaintiffs, Frangou intended the Delisting and the Tender Offer to be the near-final moves in her years-long effort to strip value from the Series G and Series H ADSs and, as a result, add value to NMH's common stock.

76.     As alleged above, at all relevant times, Frangou, through NHLC, has been the majority owner of NMH's common stock and, now, its sole owner. Frangou has never owned any of the Series G or Series H ADSs. Accordingly, at all relevant times, Frangou has had a personal conflict in favoring the interests of the common stock over the ADS holders.

77.     By issuing over 6,800,000 perpetual ADSs with dividend rights in 2014, NMH took on a significant ongoing financial obligation—*i.e.*, the payment of cumulative dividends— in exchange for close to $150 million of investors' money.

78.     Under Frangou's management and control, however, NMH has proven unwilling to meet this obligation according to the terms to which the Company agreed in the Series G and Series H Certificates of Designation. This unwillingness is rooted in Frangou's core conflict of interest: NMH's Preferred Stock ranks senior to its common stock. Accordingly, so long as all of NMH's ADSs are outstanding and/or not within her control, Frangou cannot financially benefit from her ownership of the Company's common stock (*i.e.*, receive dividends) without NMH first making the ADS holders whole or getting the ADS holders to waive their priority rights to NMH's cash (*e.g.*, redemption value, accrued and unpaid cumulative dividends) provided for in the Series G and Series H Certificates of Designation.

79.     Frangou's disloyal scheme, requires that NMH and its Board of Directors—at her direction and under her control—take all actions necessary, both lawful and unlawful, to get the ADS holders to release their priority rights to NMH's cash without the Company having to pay them the fair value for surrendering those lucrative rights. If she is ultimately successful,

COMPLAINT

Frangou will eliminate NMH's significant financial liability to the ADS holders at a fraction of the cost provided for by the terms of the Series G and Series H Certificates of Designation. This would be a direct and—as shown below—disloyal transfer of value from Plaintiffs and other ADS holders to Frangou personally.

80.     Frangou's decision to (1) take the Company private, (2) delist and deregister the ADSs after the Going Private Transaction closed, and (3) conduct the Tender Offer once the ADSs traded in the illiquid OTC markets, were all preplanned parts of Frangou's scheme. Indeed, well in advance of each of these events and in any event no later than NMH's initial public disclosures in October 2023 pertaining to the Going Private Transaction, both Frangou and the Company's loyalist Board of Directors knew that Frangou intended for each of the foregoing actions to create conditions ripe for coercing the remaining ADS holders to relinquish their priority rights to NMH's money. Accordingly, NMH's various public disclosures referenced and quoted above were false, misleading, and omitted material facts regarding Frangou's disloyal scheme that were adverse to the interests of Plaintiffs and other ADS holders.

81.     Frangou's initial effort at paring back NMH's financial responsibility to the ADS holders occurred in February 2016 when she and the Company's loyalist Board of Directors suspended the payment of dividends on the ADSs. Pursuant to the Certificates of Designation, NMH had the right to take this action, though the unpaid dividends would continue to accrue for each outstanding ADS.

82.     In September 2016, NMH launched coupled exchange offers and consent solicitations for both the Series G and Series H ADSs that stipulated any tendering ADS holder would also provide a consent to eliminate substantially all of the critical rights and protections of

COMPLAINT

their fellow ADS holders that did not tender.[1] The 2016 exchange offers initially offered Series G ADS holders either $5.85 in cash or 4.77 shares of NMH common stock and Series H ADS holders either $5.75 in cash or 4.69 shares of NMH common stock.

83.    These amounts were below the fair value of the ADSs on the NYSE, but were far greater than the amount of accrued but unpaid dividends to that point. At that point, however, NMH had only missed three quarterly dividend payments and its business was on an upswing, ADS holders therefore were able to assume they would soon be made whole if they rejected the 2016 exchange offers and consent solicitations.

84.    In response to the filing of a lawsuit threatening to seek damages, Frangou and NMH reluctantly de-coupled the exchange offers from the consent solicitations. When the Company canceled the consent solicitations and proceeded solely with non-coercive exchange offers, it even offered the ADS holders improved terms. The final 2016 exchange offers offered Series G ADS holders $7.18 in cash or 6.29 NMH shares and Series H ADS holders $7.06 in cash or 6.19 NMH shares. Ultimately, the ADS holders, who no longer faced the threat of being left with ADS devoid of any rights and protections were they to decline to take the offer, tendered only 544,987 Series G ADSs (out of 2,000,000 issued) and 1,898,285 Series H ADSs (out of 4,800,000 issued).

85.    By suspending dividend payments on the ADSs in February 2016 and thereafter repeatedly telling investors that NMH had no plans to restart the payments, Frangou and NMH's

---

[1] The changes NMH sought through the September 2016 consent solicitation included: (1) elimination of the requirement that it pay preferred stockholders accrued dividends, including both the dividends that already accrued since the suspension of dividend payments in February 2016 and future quarterly dividends that are not paid; (2) elimination of the increased dividend rate that resulted if ADS holders are not permitted to elect a director after six or more missed dividend payments; (3) elimination of the prohibition on NMH repurchasing or redeeming common or preferred shares unless all accrued dividends have been paid to preferred stockholders; and (4) lowering the voting threshold of ADS holders from two-thirds to a simple majority in order to consent to certain future actions that have a negative effect on ADS holders.

COMPLAINT

Board of Directors created for the Company a significant financial liability going forward: the unpaid cumulative dividend amounts were accruing and ballooning such that NMH was at risk of not being able to redeem and cancel all the outstanding ADSs.

86.     The stalemate over NMH's refusal to pay dividends eventually resulted in more preferred investors selling their ADSs back to NMH through an exchange offer launched in December 2018 for both series of ADSs. NMH initially offered to acquire each Series G ADS for either $4.83 in cash or $5.52 in principal amount of newly issued 9.75% Senior Notes due 2024 and each Series H ADS for either $4.77 in cash or $5.46 in principal amount of newly issued 9.75% Senior Notes due 2024.

87.     The accrued dividends at the time the offer was announced totaled approximately $6.66 per Series G ADS and $6.56 per Series H ADS—significantly more than the cash value of the consideration offered in the Exchanges Offers.

88.     Similar to its strategy in September 2016, NMH tied the exchange offer to a coercive consent solicitation: by tendering their shares, ADS holders would have consented to amend the Certificates of Designation to "eliminate substantially all of the restrictive covenants and our obligation to pay or accrue any unpaid dividends from any past periods or future periods and to amend certain voting rights."[2] This put the ADS holders in a challenging position: they could accept a drastic discount on their ADSs relative to accrued dividends and finally receive some payment from their investment or, by not tendering, risk losing critical rights and protections – *e.g.*, the right to receive any unpaid dividends– going forward if other ADS holders took the offer and a sufficient number of consents were obtained.

_____

[2] The changes NMH sought through this consent solicitation were effectively the same as those the Company sought in connection with its initial offer in September 2019.

COMPLAINT

89.     NMH made the ADS holders' decision to tender even more stark by, among other things, warning that both series of ADSs risked being delisted from the NYSE if enough were tendered. (See December 21, 2018, Registration Statement, "Questions and Answers About the Exchange Offer and Consent Solicitation," p. x.)

90.     Ultimately, as a result of a putative shareholder action filed to challenge the coercive nature of the December 2018 consent solicitation and the insufficient pricing of the offer, NMH untethered its solicitation of consents from the offer and raised the offer prices. Following the close of the December 2018 exchange offer, 884,150 Series G ADSs and 1,093,026 Series H ADSs were tendered to NMH and thereafter cancelled.

91.     Frangou and NMH were able to further reduce the number of outstanding ADSs through a September 2022 tender offer of $15.73 for each Series G ADS and $15.28 for each Series H ADS, through which 20,185 Series G ADSs and 584,158 Series H ADS were tendered. NMH did not condition the September 2022 tender offer on its receipt of any consents, coercive or otherwise. The Company did, however, warn the ADS holders that both series of ADSs risked being delisted from the NYSE if enough were tendered. (See September 14, 2022, Offer to Purchase, "Questions and Answers About the Offer," p. 6.)

92.     By the time the Going Private Transaction was announced, only 514,720 Series G ADSs (down from 2,000,000 issued) and 1,183,944 Series H ADSs (down from 4,8000,000 issued) remained outstanding. Those outstanding ADSs, however, had a liquidation value—inclusive of the accrued and unpaid cumulative dividends—of $70.5 million as of June 30, 2023.

93.     With the knowledge, approval, and acquiescence of the NMH Board of Directors both before and after the closing of the Going Private Transaction, Frangou planned to and did execute the Delisting and the Tender Offer—a clearly interested transaction—for the purpose of

artificially depressing the outstanding ADSs' market prices and eliminating their ability to be traded in a liquid market so that NMH then could coerce the remaining ADS holders into tendering their shares back to the Company for inadequate consideration that wholly fails to price in the value of the ADSs' liquidation preference or the unpaid cumulative dividends.

94.     Accordingly, at the time all the statements referenced above were made in NMH's SEC filings related to the Going Private Transaction, NMH, Frangou, and the Director Defendants each had a duty to disclose the details of Frangou's disloyal scheme as it pertained to the Series G and Series H ADSs because such information was material and adverse to the interests of Plaintiffs and other ADS holders.

95.     Plaintiffs were unaware of Frangou's scheme set forth above during the period relevant to this action.

96.     Frangou and the Director Defendants further sought to conceal Frangou's disloyal scheme from Plaintiffs and other ADS holders by issuing the pretextual January 19, 2024 press release announcing the Delisting.

97.     According to the press release, NMH's Board of Directors claimed to have balanced the costs and benefits of their decision, but it does not address to whom the benefits from the decision would flow—clearly, Frangou—because stating so would make the self-interested nature of this decision too obvious.

98.     The Board of Directors' claimed concern regarding public reporting costs is not serious. Reporting costs generally fall in the range of a few million dollars per year. These costs are negligible to NMH, which had revenues of approximately $255.4 million in 2022 and $147.3 million in the first six months of 2023 alone. NMH's most recent publicly available financial reports showed the Company had $68.9 million in cash and cash equivalents as of August 2023.

In connection with the Going Private Transaction, NMH's equity was valued at approximately $174 million.

99.     Moreover, The Board of Directors—which consisted of the same directors both before and after the Going Private Transaction closed—were well aware of the costs of public reporting to NMH well in advance of the January 19 press release. They had considered and approved those costs for years prior to Frangou taking the Company private. Accordingly, the information on which the Board of Directors supposedly based their decision to delist and deregister the ADSs was not new to them and, in fact, was known by the Board of Directors at the time NMH filed the disclosures with the SEC referenced above in which the Company repeatedly reassured investors that the ADSs would be unaffected by Frangou taking NMH private.

100.    NMH's Board of Directors was obligated to consider the benefits to the ADS holders of maintaining the NYSE listing and SEC registration, but the January 19 press release does not confirm that they did so. That value is easy to ascertain. As courts have recognized, a security's value is derived in substantial part from it being listed in a liquid market. Here, that value can be quantified by the millions of dollars in ADS value —not simply the market price, but also the per share value of the accrued and unpaid cumulative dividends—that NMH wiped out by delisting and deregistering the ADSs.

101.    Had the regulatory burden and costs related to maintaining the ADSs' listing and registration been a legitimate concern of NMH's Board of Director, they could have explored moving the ADSs to another exchange (*e.g.*, NASDAQ, regional exchanges) or set specific trading metric thresholds (e.g., volume, price, number of outstanding ADSs) that, if crossed,

COMPLAINT

would trigger delisting and deregistration. The press release does not indicate that the Board of Directors explored any such alternatives.

102.    In reality, the NMH Board of Directors' announced reasons for the Delisting are pretext. At Frangou's direction and subject to her control of the Company, the Board of Directors authorized the delisting and deregistering of the ADSs for the purpose of effectuating the next step of Frangou's disloyal scheme. The Board of Directors made the binary, all or nothing decision based solely out of consideration for Frangou's personal financial interests and not the interests of the Company's ADS holders.

## THE DIRECTOR DEFENDANTS' FIDUCIARY DUTIES

103.    NMH is incorporated in the Republic of the Marshall Islands. Generally, "[t]he Marshall Islands have adopted Delaware corporate law." F5 Cap. v. Pappas, 856 F.3d 61, 71 n.8 (2d Cir. 2017); see 52 Marsh. Is. Rev. Code Part I, § 13 (The Marshall Islands Business Corporations Act "shall be applied and construed to make the [corporate] laws of the Republic . . . uniform with the laws of the State of Delaware and other states of the United States of America with substantially similar legislative provisions. Insofar as it does not conflict with any other provision of this Act, the non-statutory law of the State of Delaware and of those other states of the United States of America . . . is hereby declared to be and is hereby adopted as the law of the Republic.").

104.    By reason of their positions as members of the NMH Board of Directors and because of their ability to control the Company's business and corporate affairs, the Director Defendants each owe the fiduciary duties of care, loyalty, good faith, and candor to all the Company's shareholders.

COMPLAINT

105.    The Marshall Islands Business Corporations Act sets forth a statutory duty of care: "[d]irectors . . . shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." 52 Marsh. Is. Rev. Code Part I, § 61.

106.    The Marshall Islands have also adopted the duty of loyalty as Delaware courts have recognized it: a director is required to act in good faith and in the best interest of the corporation and its shareholders, rather than in the director's own interests or the interests of someone to whom the director is beholden, controlled by, or otherwise dependent on.

107.    Further, the Marshall Islands have adopted the fiduciary duties of good faith and candor, both of which Delaware courts have found to be derivative of the duties of care and loyalty.

108.    Pursuant to Delaware law, a director violates the duty of good faith by acting in bad faith, *i.e.*, intentionally acting with a purpose other than that of advancing the best interests of the corporation, intentionally violating the law, or intentionally failing to act in the face of a known duty to act.

109.    Delaware courts have held that the duty of candor requires a director to communicate honestly with shareholders and to make full, fair, and truthful disclosures. Communications that depart from this honest expectation, particularly where the director involved issued the communication with the knowledge that it was deceptive or incomplete, violates the duty of candor.

110.    In addition to the duties she owes NMH's shareholders as a director, Frangou—as NMH's controlling shareholder both before and after she took the Company private—also has a fiduciary responsibility to minority shareholders like Plaintiffs to use her ability to control the

COMPLAINT

corporation in a fair, just, and equitable manner. Delaware law provides that majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which majority shareholders put the corporation or their power to control the corporation must benefit all shareholders proportionately.

111.    NMH's directors owe Plaintiffs—who have the rights of preferred shareholders based on both series of Preferred Stock underlying the ADSs—the same fiduciary duties they owe to the Company's common shareholders. Delaware courts have recognized that directors owe fiduciary duties to preferred shareholders as well as common shareholders where the right claimed by the preferred is not to a preference as against the common stock (as set forth in a certificate of designation) but rather a right shared equally with the common. Here, the Certificate of Designation for the Series G Preferred Stock provides that in addition to the rights and preferences therein, the ADS holders are afforded all rights provided by applicable law.

## **FIRST CAUSE OF ACTION**

### **Breach of Fiduciary Duty**

**(Plaintiffs against Defendant Frangou, as NMH's Controlling Shareholder)**

112.    Plaintiffs incorporate by reference and reallege each and every allegation in the preceding paragraphs as though fully set forth herein.

113.    Through her ownership of NLHC, Frangou has owned more than 50% of NMH's common stock at all times relevant to Plaintiff's claims in this action. Accordingly, Frangou is NMH's controlling shareholder.

114.    As NMH's controlling shareholder, Frangou owes NMH's minority shareholders the fiduciary duties of care, loyalty, good faith, and candor, and is obligated not to use her power

COMPLAINT

to control NMH's corporate activities to benefit her interests alone or in a manner detrimental to the minority.

115. As Series G ADS holders, both Plaintiffs are minority shareholders of NMH.

116. As a Series H ADS holder, Plaintiff Forbes is a minority shareholder of NMH.

117. By virtue of her position as NMH's controlling shareholder and her exercise of control and ownership over the Company's business and corporate affairs, Frangou had the power to direct, control, and influence the Company's actions at all relevant times.

118. As alleged herein, Frangou used her power as NMH's controlling shareholder to direct, control, and influence the Company's directors and management to cause NMH (1) to make false and misleading public statements in connection with the Going Private Transactions that gave Plaintiffs, as ADS holders, false assurance that NMH would maintain the status quo for both series of the ADSs after going private by keeping them listed with the NYSE and registered with the SEC; (2) to omit from those same public statements material information regarding her disloyal plan for NMH, once under her ownership, to reduce the number of its outstanding ADSs by executing the Delisting and the subsequent coercive Tender Offer; (3) to initiate and execute the Delisting, despite it being a clearly interested transaction; and (4) to issue a press release containing a false and pretextual explanation for the Delisting.

119. Frangou breached the fiduciary duties she owed Plaintiffs, as ADS holders, by using her powers as NMH's controlling shareholder to direct, control, and influence the Company's directors and management to cause NMH to perform the acts detailed above.

120. Specifically, Frangou breached, at a minimum, her duties of loyalty, candor and good faith by using her control of NMH to initiate and execute a transaction—the Delisting—on

COMPLAINT

which she stood on both sides and for which she would solely benefit at the expense of Plaintiffs and other ADS holders.

121.    Further, Frangou breached, at a minimum, her duties of loyalty, candor, and good faith by using her powers as NMH's controlling shareholder to direct, control, and influence the Company's directors and management to make misleading public statements that had the effect of concealing from Plaintiffs and other ADS holders material information about Frangou's faithless scheme to take certain actions—the Delisting and the subsequent tender offer—to coerce the remaining ADS holders into giving up their preferred right to accrued and unpaid dividends.

122.    As a result of Frangou's foregoing breaches of her fiduciary duties, Plaintiffs each were damaged in amounts subject to proof at trial.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

**(Plaintiffs against the Director Defendants)**

123.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

124.    The Director Defendants, as members of NMH's Board of Directors, owe the Company's shareholders fiduciary duties of care, loyalty, good faith, and candor.

125.    By virtue of their position as NMH's directors, the Director Defendants—Frangou, along with the loyalist directors she appointed, employed, dominates, and controls (*e.g.*, Magoulas, Malanga, Stratakis, and Sasada)—had the power to influence, direct and cause the Company to act.

32

COMPLAINT

126.    As alleged herein, the Director Defendants, as members of the Board of Directors, caused and/or authorized NMH (1) to make false and misleading public statements in connection with the Going Private Transactions that gave Plaintiffs, as ADS holders, false assurance that NMH would maintain the status quo for both series of its ADSs after going private by keeping them listed with the NYSE and registered with the SEC; (2) to omit from those same public statements material information known to each of them regarding Frangou's disloyal plan for NMH, once under her ownership, to reduce the number of its outstanding ADSs by executing the Delisting and the subsequent coercive Tender Offer; (3) to initiate and execute the Delisting, despite it being a clearly interested transaction; and (4) to issue a press release containing a pretextual explanation for the Delisting.

127.    The Director Defendants, as members of the Board of Directors, breached the fiduciary duties they each owed Plaintiffs, as ADS holders, by causing and/or authorizing NMH to perform the acts detailed above.

128.    Specifically, the Director Defendants, all of whom were and are dominated by, controlled by, or obligated to Frangou, at a minimum breached their duties of loyalty, candor, and good faith by knowingly supporting or authorizing Frangou's instruction that the Company initiate and execute a transaction—the Delisting—on which she stood on both sides and for which she would solely benefit at the expense of Plaintiffs and other ADS holders. The Director Defendants further breached their fiduciary duties by authorizing the Delisting despite knowing that (1) Frangou controlled the process; (2) the Board of Directors did not delegate the decision regarding delisting to a committee of disinterested directors; (3) the Board of Directors did not actually weigh the costs versus the benefits to NMH for listing and registering either series of the ADSs as they claimed in the January 19 press release announcing the Delisting, and (4) the costs

33

COMPLAINT

versus benefits of keeping the ADSs listed with the NYSE and registered with the SEC were facts well known to the Board of Directors long in advance the close of the Going Private Transaction and the January 19 press release, and had this been an actual rather than pretextual concern, it should have been disclosed in NMH's SEC filings related to the Going Private Transaction.

129.    Further, the Director Defendants, all of whom were and are dominated by, controlled by, or obligated to Frangou, at a minimum breached their duties of loyalty, candor, and good faith by authorizing the Company to make misleading public statements in connection with the Going Private Transaction that had the effect of concealing from Plaintiffs and other ADS holders material information about Frangou's disloyal scheme to take certain actions—the Delisting and the subsequent Tender Offer—to coerce the remaining ADS holders into giving up their preferred right to accrued and unpaid dividends.

130.    As a result of the Director Defendants' respective breaches of their fiduciary duties, Plaintiffs each were damaged in amounts subject to proof at trial.

### THIRD CAUSE OF ACTION

### Common Law Fraud and Deceit

**(Plaintiffs against Defendants NMH, Frangou, and the Director Defendants)**

131.    Plaintiffs incorporate by reference and reallege each and every allegation in the preceding paragraphs as though fully set forth herein.

132.    In connection with the Going Private Transaction, NMH publicly filed with the SEC the Company's November 13, 2023 Schedule 13E-3, its November 13, 2023 Proxy Statement to its common shareholders, and other documents referenced above. After their filing, these documents were disseminated by the financial press and through the Internet to Plaintiffs,

COMPLAINT

other ADS holders, and other members of the investing public. These documents were and are also accessible through the SEC's online EDGAR database.

133.    The members of the NMH Board of Directors, including the Director Defendants, knew the substance and content of each of the documents referenced above, and authorized them to be filed with the SEC.

134.    Frangou, as the Company's CEO, Chairwoman, and controlling shareholder both before and after the Going Private Transaction, sufficiently controlled the Board of Directors and NMH's management such that she too knew the substance and content of each document, and she intended for each of them to be filed with the SEC.

135.    As alleged herein, each of NMH's documents referenced above contained at least one false and misleading statement regarding the Going Private Transaction's impact on the ADSs held by Plaintiffs. Despite minor variations of the content of these statements in the various documents referenced above, they all conveyed two purported facts: (1) both series of the Company's ADSs would be "unaffected" by the Going Private Transaction, and (2) after the transaction closes, the ADSs will "remain outstanding as identical securities" of the newly private NMH.

136.    The documents referenced above made no mention of a proposed or potential delisting of the ADSs from the NYSE following the closing of the Going Private Transaction.

137.    NMH, Frangou, and the Direct Defendants intended for Plaintiffs to rely on this false assurance that under Frangou's sole ownership, NMH would maintain the status quo for the ADSs, such that the Going Private Transaction would not change the nature of their investments.

138.    NMH, Frangou, and the Direct Defendants knew that these false and misleading statements did not address and, in fact, were intended to conceal from ADS holders that (1)

COMPLAINT

Frangou planned to launch a surprise Delisting of the ADSs shortly after taking the Company private for the purpose of crushing their value and rendering the investment illiquid; and (2) she then planned to announce the Tender Offer to buy as many ADSs as possible from distressed investors at depressed prices for the purpose of coercing ADS holders to give up their preferred rights (*i.e.*, each ADSs' right to a redemption price, as well as unpaid and accrued dividends).

139.    Plaintiffs did rely on the statements in the above-referenced documents as NMH, Frangou, and Director Defendants intended. Because NMH, Frangou, and Director Defendants provided no information to the contrary, Plaintiffs expected the ADSs they hold to remain listed and tradable on the NYSE and registered with the SEC after the close of the Going Private Transaction.

140.    In reliance on NMH's statements, both Mr. Dintzer and Ms. Forbes believed that the Going Private Transaction posed no risk to their respective investments and, accordingly, held their ADSs through the Going Private Transaction's closing without selling any portion of their respective holdings.

141.    Had both Mr. Dintzer and Ms. Forbes known that NMH's foregoing statements were false, misleading, and omitted material information relating to Frangou's intentions for delisting both series of ADSs after taking the Company private, they both would have sold most, if not all, of their respective ADS investments to avoid significant financial losses, as well as the loss of liquidity.

142.    As a direct and proximate result of NMH's, Frangou's and the Director Defendants' fraudulent conduct alleged herein, Plaintiffs each were damaged in amounts subject to proof at trial.

COMPLAINT

143.    The foregoing course of conduct by NMH, Frangou, and the Director Defendants was intended to cause injury to Plaintiffs and constituted despicable conduct carried on in willful and conscious disregard of Plaintiffs' rights, so as to constitute malice, oppression or fraud, thereby entitling Plaintiffs to an award of punitive and exemplary damages.

**FOURTH CAUSE OF ACTION**

**Enforcement of Shareholder's Right to Inspect Books and Records**

**(Plaintiff Jeffrey Dintzer against Defendant NMH)**

144.    Plaintiffs incorporate by reference and reallege each and every allegation in the preceding paragraphs as though fully set forth herein.

145.    Section 81 of the Marshall Islands Business Corporations Act provides, in relevant part, that "[a]ny shareholder . . . or by an attorney or other agent, may . . . inspect, for a purpose reasonably related to his interests as a shareholder, . . .  and make copies or extracts from the share register, books of account, and minutes of all proceedings."

146.    In an April 2, 2024, letter addressed to NMH's Executive Vice President  of Legal, Vasiliki Papaefthymiou, Mr. Dintzer's attorney expressed his client's concern about NMH's motives for delisting and deregistering the Series G Preferred Stock and ADSs, and requested that the Company provide Mr. Dintzer with copies of the following documents and materials pursuant to his shareholder inspection rights so that he could better assess the veracity of the NMH Board of Director's statement in the January 19, 2024, press release that their "careful consideration . . . [and] a review of several factors" led to their decision to delist and deregister the Series G Preferred Stock and ADSs:

37

COMPLAINT

    a.   All Board minutes and presentations reflecting discussions of the Merger and/or any advantages and disadvantages of continuing listing and registration of any class of NMH's securities;

    b.   All communication with any officer or director of NMH concerning the advantages and disadvantages of continuing listing and registration of any class of NMH security;

    c.   Notes taken by any director concerning the advantages and disadvantages of continuing listing and registration of any class of NMH security; and

    d.   Any director independence and conflict disclosures.

147.    Neither Papaefthymiou nor anyone else from NMH or the NMH Board of Directors responded to Mr. Dintzer's inspection demand. As of the filing of this complaint, NMH has neither served Mr. Dintzer with written objections to his specific document requests nor received any explanation why the Company chose not to comply with his inspection demand.

148.    As of the filing of this complaint, NMH has not produced or made available any of the documents and materials Mr. Dintzer requested.

149.    Pursuant to Section 84 of the Marshall Islands Business Corporations Act, Mr. Dintzer seeks an order from the Court compelling NMH and its Board of Directors to comply with his inspection demand and awarding such further relief as this Court may seem just and proper.

150.    Mr. Dintzer further requests that the Court order all expenses related to the inspection be paid, or at least shared, by NMH.

COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

1.      Finding the Defendant Frangou, as NMH's controlling shareholder, liable for breaching her fiduciary duties to Plaintiffs;

2.      Finding the Director Defendants liable for breaching their fiduciary duties to Plaintiffs;

3.      Awarding Plaintiffs their respective damages, together with pre- and post-judgment interest;

4.      Awarding Plaintiffs punitive and exemplary damages;

5.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees;

6.      Ordering NMH to permit Mr. Dintzer, by and through his undersigned counsel, to inspect and copy those of the Company's books and records sufficient to satisfy his purposes; and

7.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on any issue so triable of right.

 Dated: June 2, 2025

                                        */s/ Andrew M. Purdy*
                                        Andrew M. Purdy (SDNY Bar No. AP7227)
                                        **BROWN, NERI, SMITH & KHAN, LLP**
                                        650 Town Center Drive, Suite 520
                                        Costa Mesa, CA 92626
                                        Tel: (949) 676-0030
                                        Fax: (949) 676-0035
                                        andrew@bnsklaw.com

COMPLAINT

Ethan J. Brown (*pro hac vice* forthcoming)
Thomasin K. Bernhardt (*pro hac vice* forthcoming)
**BROWN, NERI, SMITH & KHAN, LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, CA 90025
Tel: (310) 593-9890
Fax: (310) 593-9980
ethan@bnsklaw.com
thomasin@bnsklaw.com

Attorneys for Plaintiffs
JEFFREY D. DINTZER and AMY R. FORBES

COMPLAINT